826 So.2d 968 (2002)
Ana Maria CARDONA, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-1366.
Supreme Court of Florida.
July 11, 2002.
Rehearing Denied September 11, 2002.
*969 Todd G. Scher, Litigation Director, Capital Collateral Regional Counsel-South, Fort Lauderdale, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Lisa A. Rodriguez, Sandra Jaggard, and Stephen D. Ake, Assistant Attorneys General, Tampa, FL, for Appellee.
PER CURIAM.
Ana Maria Cardona appeals an order of the circuit court denying a motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We conclude that we are compelled to reverse and that a new trial is required because the State committed a Brady[1] violation by failing to disclose material criminal investigation reports of the State's extensive interviews with Olivia Gonzalez-Mendoza ("Gonzalez"), Cardona's codefendant and the State's key witness against Cardona.

BACKGROUND
Cardona and codefendant Gonzalez were charged with first-degree murder and aggravated child abuse for the death of Cardona's three-year-old son, Lazaro Figueroa, *970 after Lazaro's battered body was found in the bushes of a Miami Beach residence on November 2, 1990. See Cardona v. State, 641 So.2d 361, 361 (Fla.1994). On February 14, 1992, Gonzalez changed her previously entered not guilty pleas to guilty in exchange for a reduced charge of second-degree murder pursuant to a plea arrangement in which Gonzalez agreed to testify against Cardona.
The critical issue in this case was whether Gonzalez, rather than Cardona, was the prime perpetrator of the escalating abuse that culminated in the child's death. At trial, the State's strategy, based on Gonzalez's testimony, was to paint Cardona as the more culpable defendant. The withheld reports of the interviews, which were generated before Gonzalez's plea agreement with the State, contradicted her subsequent trial testimony in certain material points. Had the reports been given to the defense, they could have seriously undermined Gonzalez's credibility, Gonzalez's version of events, and the State's portrayal of Cardona as the more culpable defendant.
The jury found Cardona guilty and recommended death by a vote of eight to four without knowing of the significant contradictions in Gonzalez's initial version of the crime that she gave to the State. Gonzalez was not only the key State witness but the only witness to the escalating abuse the State claimed Cardona committed against the child. The trial court found only one aggravator, that the murder was committed in a "heinous, atrocious or cruel" ("HAC") manner. See id. at 363. However, the trial court gave this aggravator "overwhelming and enormous weight" because of the "long period of time over which this baby was subject to torture, abuse, pain, and suffering." Id.[2] Because of the weight assigned to the HAC aggravator and the facts in the record detailing the extensive suffering of the victim, the trial court found that the single aggravator outweighed the mitigators, see id., and sentenced Cardona to death without knowing of the significant contradictions in Gonzalez's initial version of the crime regarding the escalating pattern of abuse. On direct appeal, this Court concluded that the death sentence was proportionate because our review of the record led us to "agree with the trial court that, in light of the extended period of time little Lazaro was subjected to the torturous abuse leading to his death, the ultimate sentence is warranted in this case." Id. at 365. We also rejected Cardona's claim regarding the relative culpability of Gonzalez because "the record in this case supports the trial court's finding that Cardona was the more culpable of the two defendants" and "[t]hus disparate treatment is justified." Id. On direct appeal, this Court did not have the benefit of the significant contradictory version of events that Gonzalez earlier gave to State investigators.
Cardona timely filed a motion for post-conviction relief and filed an amended motion raising thirteen claims.[3] A *971 Huff[4] hearing was held, at which the trial court granted an evidentiary hearing on seven claims,[5] and summarily denied the remaining claims. After the evidentiary hearing, the trial court denied relief on the remaining claims. Cardona now appeals the trial court's denial of postconviction relief, raising nineteen issues for this Court's review.[6]
Because we conclude that Cardona's claim of a Brady violation is dispositive, we focus our analysis on that claim only. Cardona's Brady claim is based upon the State's failure to disclose three typed criminal investigation reports and a proffer letter from Gonzalez's attorney to the State outlining the substance of what Gonzalez was prepared to testify to at Cardona's trial. The typed criminal investigation reports were generated as a result of three interviews between the State's investigators and Gonzalez on September 19, 24, and 30, 1991. Both the reports and the proffer letter were generated before the State accepted an agreement that Gonzalez would plead guilty to a reduced charge of *972 second-degree murder in exchange for Gonzalez's testimony at Cardona's trial.
Following an evidentiary hearing on the Brady claim, the trial court made the following findings and conclusions:
As to defense counsel's contention that Brady material was withheld by not providing counsel with the investigators' reports from the State Attorney's Office, it is abundantly clear to this Court that those reports would have assisted defense counsel in impeaching Olivia Gonzalez Mendoza, but that she was sufficiently impeached to a point where they needed not even call the polygraph examiners[[7]] to impeach her testimony. Thus, the testimony of the prior codefendant was not necessary to obtain the defendant's conviction. Thus there was no prejudice to the defendant by failing to produce the 2 reports, or the proffer letter from Gonzalez Mendoza's attorney.
There was no reasonable probability that any omitted evidence would have changed the conclusion of this jury.[[8]]
(Emphasis supplied.)

ANALYSIS
In Rogers v. State, 782 So.2d 373, 378 (Fla.2001), we quoted with approval from the United States Supreme Court's decision in Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), where the Court summarized the important constitutional principles arising from the State's failure to disclose material evidence to the defendant:
In Brady, this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, and that the duty encompasses impeachment evidence as well as exculpatory evidence.... In order to comply with Brady, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."
These cases, together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."
Id. at 280-81, 119 S.Ct. 1936 (citations and footnote omitted). The principle necessitating reversal when the State fails to disclose to the defense material favorable evidence was espoused in Brady itself:
The principle ... is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. *973 Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.... A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice....
373 U.S. at 87-88, 83 S.Ct. 1194. Therefore, as stated in Rogers, 782 So.2d at 376-77, errors involving the suppression of evidence in violation of Brady raise issues of constitutional magnitude.
In order to establish a Brady violation, a defendant must prove:
The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.
Way v. State, 760 So.2d 903, 910 (Fla.2000) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). Thus, not every instance where the State withholds favorable evidence will rise to the level of a Brady violation necessitating the granting of a new trial, but only those where there is a determination that the favorable evidence that was withheld resulted in prejudice. The determination of whether a Brady violation has occurred is subject to independent appellate review. See Rogers, 782 So.2d at 377; Way, 760 So.2d at 913.
With respect to the typed criminal investigation reports, there is no question that the first two prongs of Brady are satisfied. With regard to the first prong, the trial court found that the withheld materials would have assisted in the impeachment of Gonzalez. Thus, there is no question that the evidence is favorable, which satisfies the first prong of Brady. As to the second prong, the State does not dispute that it should have but failed to turn over the reports from the interviews with Gonzalez. Thus, the second prong of Brady is satisfied.
We next conduct an independent review of the third prong of Brady; that is whether Cardona was prejudiced by the nondisclosure or withholding of this favorable evidence. See Rogers, 782 So.2d at 377; Way. 760 So.2d at 913. For Brady purposes, "the defendant must establish that the defense was prejudiced by the State's suppression of evidence, in other words, that the evidence was material." See Way, 760 So.2d at 912-13. As we explained in Way, "[a] showing of materiality `does not require demonstration by a preponderance that disclosure of the suppressed evidence would have ultimately resulted in the defendant's acquittal.'" 760 So.2d at 913 (quoting Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Rather, as the United States Supreme Court has explained:
[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."
Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles, 514 U.S. at 435, 115 S.Ct. 1555) (citations omitted). Further, the cumulative effect of the suppressed evidence must be considered when determining materiality. See Way, 760 So.2d at 913 (citing Kyles, 514 U.S. at 436 & n. 10, 115 *974 S.Ct. 1555). "It is the net effect of the evidence that must be assessed." Way, 760 So.2d at 913 (quoting Jones v. State, 709 So.2d 512, 521 (Fla.1998)); see Kyles, 514 U.S. at 436 & n. 10, 115 S.Ct. 1555.
The State argues that any impeachment by the defense through the withheld evidence would have been cumulative to the impeachment of Gonzalez at trial. Thus, because the State asserts that any impeachment would have been cumulative, the State argues it was not material and Cardona cannot satisfy the prejudice prong of Brady. Specifically, the State asserts that Gonzalez already was impeached with respect to her bias as a State's witness when defense counsel elicited testimony that Gonzalez "did not have to worry about the death penalty anymore" because of her plea. However, the fact that a witness is impeached on other matters does not necessarily render the additional impeachment cumulative. See United States v. Rivera Pedin, 861 F.2d 1522, 1530 (11th Cir.1988) ("We acknowledge that Ream's credibility had been eroded due to the testimony the defense elicited from him on cross-examination. The disclosure of Ream's conversation with Miller, however, would not have been merely repetitious, reinforcing a fact that the jury already knew; instead, `the truth would have introduced a new source of potential bias.'") (quoting Brown v. Wain-wright, 785 F.2d 1457, 1466 (11th Cir. 1986)).
We turn to an analysis of the significance of this impeachment, noting that Gonzalez was a crucial witness for the State. Gonzalez was the most important witness to testify as to which of the two defendants was the more culpable, and to the escalating abuse the State claimed Cardona committed against Lazaro. Gonzalez was the only witness who testified to the significant events of the day preceding Lazaro's death and the day of Lazaro's death.
We conclude that the reports of the undisclosed interviews contain material inconsistencies on several key points not addressed at trial that could have seriously undermined Gonzalez's credibility. Specifically, the reports of the undisclosed interviews contradicted Gonzalez's trial testimony in four ways that could have been used as powerful impeachment of Gonzalez at trial: (1) the description of the events of the day before Lazaro died; (2) the description of the events of the day Lazaro died; (3) the details of the abuse described; and (4) the date when Gonzalez last abused Lazaro.
First, with regard to the events of October 31, 1990, the day before Lazaro died, at trial Gonzalez described a specific incident on the "last day of October" when Cardona "got pissed off and she hit [Lazaro] with a bat over the head" because Lazaro was slow in taking off his diapers. Gonzalez stated that Cardona struck Lazaro with such force that "[a] hole was opened up in his head. His head was cracked." Gonzalez explained that the wound "started bleeding and bleeding and bleeding, and then I put mercury on it and I applied a plastic band." This incident occurred "like six or seven in the evening." We relied on this testimony in detailing the facts on direct appeal of the day before Lazaro died:
According to Gonzalez Mendoza, on the last day of October 1990, Cardona, severely beat Lazaro with a baseball bat. After splitting the child's head open, Cardona locked the little boy in the closet where he had been confined for the last two months.
Cardona, 641 So.2d at 362.
The report of the September 19, 1991, interview of Gonzalez regarding this same night materially contradicts her trial testimony *975 by specifically stating that on the last day of October nothing unusual had occurred:
Ms. Gonzalez reports that on October 31, 1991[sic], she worked from 1 P.M. to 7 P.M. at the factory (this information was verified). Ms. Gonzalez reports that she arrived home at approximately 8 P.M. Ms. Gonzalez reports that she came straight home because she promised the kids to take them out for Halloween (trick or treating).
According to Ms. Gonzalez, when she arrived home from work, everything was as usual. Taimi and Juanito were getting dressed to go out for Halloween. She noticed that Lazaro was in the closet gagged and bound but had no noticeable injuries. Ms. Gonzalez reports that she did not notice anything unusual because Lazaro was always tied in the closet.
When Taimi, Juanito, and Olivia returned home, Ana Cardona, who had stayed home, was in bed watching television and Lazaro was still in the closet (as usual).
(Emphasis supplied.)
Gonzalez was never impeached with regard to the October 31, 1990, incident graphically detailed by Gonzalez at trial and relied on by this Court in its discussion of the facts on direct appeal. See Cardona, 641 So.2d at 362. Cardona could not impeach Gonzalez because she did not have the inconsistent description of the events contained in the interviews. The significant contradiction is that Gonzalez initially stated in the interview that October 31, 1990, was a usual day and that Lazaro had no noticeable injuries. However, after meeting with the prosecutors, Gonzalez testified that on October 31, 1990, Cardona struck Lazaro with such force that "[a] hole was opened up in his head. His head was cracked."
Gonzalez's trial testimony regarding October 31, 1990, also is contrary to the report of her September 30, 1991, interview with State investigators, which states: "According to Ms. Gonzalez, the last time she remembers seeing Ms. Cardona hitting Lazaro with the wooden bat was approximately a week before his death." Moreover, as to Lazaro's massive head wound, the same report states: "Ms. Gonzalez stated that Ms. Cardona beat Lazaro with the bat very badly about a month before his death. According to Ms. Gonzalez, Cardona lacerated Lazaro's head and broke his arm." (Emphasis supplied.) October 31 was the day before Lazaro's death, not a week or a month before. Given the State's themes that towards the end of Lazaro's life the injuries were inflicted by Cardona, and that Gonzalez's participation in the abuse was minimal, the impeachment based on these interview reports would have been valuable.
The second way that the interview reports contradict Gonzalez's trial testimony was with regard to Gonzalez's description of the day Lazaro died. At trial, Gonzalez provided the following description of that day:
GONZALEZ: I came home from work. I opened up the door to the closet to see the boy, and he started screaming because his mother was coming behind me, he was frightened of her.
STATE: Was his mouth taped?
GONZALEZ: No, at that moment it was not. I confronted him with the bat. I told him I was going to hit him if he did not shut up, but the mother, the defendant, grabbed it from my hand and stayed with it. When I thought, that she was going to put tape over his mouth and put him in the closet again. I went to bathe. When I came out of the bathroom, she told me, "I believe I killed him." I *976 went running, looking for him. He was lying down in the closet, looking up, with a piece of paper in his mouth. I tried to revive him. I grabbed alcohol, water, I poured water and alcohol over his head. I tried to pick him up, but no, it didn't do anything. He stayed immobile. That's when she took him, got him dressed, put tape around the Pampers, wrapped him in a bedspread, told me that we had to dump him. I told her about taking him to the hospital or something. She told me whether I was crazy or was I a snitch. She went out first to see whether there was anyone out there. I was terrified and frightened. I had never think such a thing. I got frightened by her, by the attitude she had. And I climbed in the car with her, I drove off, drove and drove. I don't know. I did not know of any fixed place to go to. I went toward the beach. I drove by Alton Road, and by one of those houses on Alton Road. She told me to stop. She took the child out of the bedspread. It fell to the ground. She picked him up with her hands and she left with him. I stayed with the hand over the steering wheel like this. I don't know. I don't know where she placed him. That was all.
We relied on this testimony in reciting the facts regarding the day of Lazaro's death on direct appeal:
The next day, Gonzalez-Mendoza opened the closet door and attempted to quiet Lazaro by frightening him with the bat. When Lazaro began to scream at the sight of his mother, Cardona grabbed the bat from Gonzalez-Mendoza. Gonzalez-Mendoza then left the room. When she returned, Cardona told her that Cardona believed she had killed Lazaro. After dressing the child, the two women took Lazaro to a Miami Beach residence and abandoned him in some bushes, where he was later found.
When Cardona learned that the child's body had been found she and Gonzalez-Mendoza fled to the Orlando area and then to St. Cloud, where they were later arrested. Cardona told police various stories about what had happened to Lazaro. Finally, Cardona claimed that the child had fallen off the bed and injured himself. When she couldn't revive him, she took the boy to a Miami Beach residence and left him on a doorstep so the people who owned the house could help him. Gonzalez-Mendoza concurred in each of the stories.
Cardona, 641 So.2d at 362.
This trial testimony differs significantly from Gonzalez's previous statements in the interviews on several points. First, the report of the September 19, 1991, interview states that Gonzalez reported that she arrived home from work to find Cardona screaming, "He fell off the bed!" Second, the report of that same interview does not indicate that Gonzalez went to take a bath, but rather, it indicates that she found that Lazaro was dead immediately after seeing Cardona. Third, the report of that interview does not indicate that Gonzalez ever tried to revive Lazaro. Fourth, the report of that interview states that Gonzalez reported that she and Cardona accidentally ended up at a hospital while driving around looking for a place to dump Lazaro. However, at trial, Gonzalez testified that before they got in the car with Lazaro's body, Gonzalez suggested taking Lazaro to a hospital for treatment.
Gonzalez was the only witness who testified as to the events of that day. Thus, impeachment of her inconsistencies with regard to the facts of the day's events would have been valuable to the defense. Particularly valuable would have been impeachment of Gonzalez's testimony that *977 she was taking a bath while the alleged fatal blow was inflicted, that she tried to revive Lazaro, and that she suggested taking Lazaro to the hospital. This testimony contradicted Gonzalez's earlier statements in the interviews, and supported the State's themes that Cardona inflicted the fatal blow, that Gonzalez was a minor participant in the abuse, that Gonzalez participated only because she was a "battered spouse," whose abuse of Lazaro pleased Cardona, and that Gonzalez had far more remorse than Cardona.
Gonzalez was never impeached with most of the details regarding this contradictory testimony of the events of the day Lazaro died because Cardona had no information available with which to impeach Gonzalez on these points. Although the jury was made aware through the State's direct examination that when Gonzalez was apprehended she originally lied by telling the police that the child suffered the fatal blow when he jumped off the bed, at trial Gonzalez explained her reasons for lying to the police as follows:
STATE: Why were you lying to Detective Schiaffo?
GONZALEZ: To say that what [Cardona] told me to say.
STATE: Why?
GONZALEZ: I was scared that she would have said it was me because she was going to say it was me, that she was always going to accuse me. This is why I tried to defend her there.
However, the reason for lying to the police that Gonzalez gave to the jury at trial no longer existed at the time of Gonzalez's undisclosed interviews with the State. Thus, Gonzalez could not have given that same reason to explain the inconsistency between the undisclosed interview reports and the trial testimony had the defense been given the opportunity to cross-examine Gonzalez with the undisclosed report.
The third way the interview reports differ from the trial testimony is that in her trial testimony, Gonzalez provided graphic detail to the jury about types of abuse she observed Cardona inflict on Lazaro. Once again, on direct appeal we relied on many of these details provided at trial by Gonzalez:
During an eighteen-month period that began after the children were returned to her, Cardona beat, choked, starved, confined, emotionally abused and systematically tortured Lazaro. The child spent much of the time tied to a bed, left in a bathtub with the hot or cold water running, or locked in a closet. To avoid changing Lazaro's diaper for as long as possible, Cardona would wrap duct tape around the child's diaper to hold in the excrement.
Cardona, 641 So.2d at 362.
In contrast to these details, the report of the interview of September 19, 1991, states only:
According to Ms. Gonzalez, Lazaro Figueroa was emotionally and physically abused on a daily basis by both Ana Cardona and herself. Since the abuse occurred so often, [Gonzalez] stated she could not be specific on times dates and locations.
The report of the September 30, 1991, interview states:
Ms. Gonzalez reports that the first time she remembers hitting Lazaro was during the time that Ms. Gonzalez and Ms. Cardona were living in the hotels. However, Ms. Gonzalez does not remember what hotel they were living in, nor a specific incident when she hit Lazaro, or why she hit him.
Gonzalez's lack of recollection in the interviews is in marked contrast to her graphic descriptions for the jury of specific instances of abuse at every location where she and Cardona ever lived. Her admission *978 in the interviews that she and Cardona abused the boy on a daily basis also is contrary to her protestations at trial that she did not abuse the boy as much as Cardona.
The fourth way in which the interview reports contradict the trial testimony is with respect to when Gonzalez herself last abused Lazaro.[9] At trial, on her redirect examination, Gonzalez expressly disavowed striking Lazaro with the bat in the months before his death:
STATE: You hit Lazaro in the head with a bat?
GONZALEZ: No.
STATE: During all those months prior to his death?
GONZALEZ: No.
STATE: Do you know who did?
GONZALEZ: Yes.
STATE: Who did?
GONZALEZ: [Cardona] did.
The State's position at trial was that although Gonzalez participated in the abuse of Lazaro, she did so at the behest of Cardona. In closing argument, the State emphasized that Gonzalez was not involved in the abuse in the last two months:
However, Olivia Gonzalez came in here and told you what her participation was. Defense counsel says to you, "Oh well, you admitted to hitting him with a bat; right?" Yes she did. She admitted to you, "Yes I did hit him with a bat," but she has told you, "I did not hit him in the last couple months of his life."
(Emphasis supplied.)
The State's theory that Gonzalez did not hit Lazaro with the bat in the last couple of months leading up to Lazaro's death is contradicted by the report of the September 19, 1991, interview of Gonzalez, which states:
Ms. Gonzalez reports that while they were living at 5976 S.W. 3rd Street, approximately one month before Lazaro's death, Ms. Gonzalez remembers having hit Lazaro with the wooden bat. According to Ms. Gonzalez, Ms. Cardona let Lazaro out of the closet. Ms. Gonzalez reports that she was "on drugs" and Lazaro started to bother her. Ms. Gonzalez was not able to be more specific; however, she recalls that she hit him with the bat. According to Ms. Gonzalez she does not remember in what part of Lazaro's body she hit him or how many times she struck him. After Ms. Gonzalez beat Lazaro with the bat, Ms. Cardona "Tied him up again, and threw him in the closet."
(Emphasis supplied.)
Because the State withheld these statements, the prosecutor was free to buttress Gonzalez's claim that she did not hit Lazaro in the last few months of his life. The key feature of the defense was that Lazaro's ultimate death was from head trauma caused by Gonzalez hitting him with the bat. Even the prosecutor conceded at the evidentiary hearing that "[t]he issue, the big issue was who hit Lazaro in the head with a baseball bat." The State's position at trial, supported solely by Gonzalez's testimony, was that it was Cardona who beat Lazaro with the bat while Gonzalez "went to bathe."
The State points to the record of the direct appeal in which defense counsel already *979 impeached Gonzalez on this point. In preparation for using Gonzalez as a State's witness, State investigators had Gonzalez submit to a polygraph examination conducted by George and Brian Slattery. In that examination, Gonzalez made admissions that could not come into evidence, but with which defense counsel did impeach Gonzalez:
DEFENSE: You admitted to Brian Slattery on October 2nd that you hit Lazaro with a bat; correct?
GONZALEZ: Under pressure.
DEFENSE: And you advised that you could havethat Lazaro could have died after you hit him; correct?
GONZALEZ: No, I did not admit that.
DEFENSE: You didn't admit that?
GONZALEZ: No.
DEFENSE: Would you like to look at the statement you gave Mr. Slattery?
GONZALEZ: I don't want to see it.
DEFENSE: But you're sure you didn't say that?
GONZALEZ: No, I've never admitted that I killed the child.
DEFENSE: You never told Mr. Slattery that you could have caused Lazaro's death by hitting him with the bat?
GONZALEZ: No.
DEFENSE: You never admitted to Mr. Slattery after you hit Lazaro he went motionless?
GONZALEZ: No. I don't recall.
DEFENSE: Do you not recall or are you denying that you ever made those statements.
GONZALEZ: I don't recall, under pressure I made many statements.
DEFENSE: Isn't it a fact that after you made these statements to Mr. Slattery, he asked you if you felt comfortable saying those things?
GONZALEZ: Yes.
Although the State is correct that Gonzalez already was impeached to some extent on this issue, Gonzalez testified to her excuse, that she "was under pressure, I didn't know what I was saying. I was frightened." Moreover, on redirect, the prosecution elicited from Gonzalez that Gonzalez was nervous because she did not believe that the Slatterys were "always working in [her] best interest." However, the report of the September 30, 1991, interview indicates that Gonzalez freely admitted, without the "fear" and "pressure" she testified to having felt from the Slatterys, that one month before Lazaro's death Gonzalez "remembers having hit Lazaro with the wooden bat" but could not be specific as to "what part of Lazaro's body she hit him or how many times she struck him." Thus, the suppressed report would have provided further impeachment of Gonzalez by, at least, rebutting Gonzalez's excuse that she made the alleged admission "under pressure."
Given the nature of the impeachment that would have been available to the defense, it also is important to the consideration of the Brady claim that Gonzalez was not just another witness for the State Gonzalez was the State's critical witness, both in establishing Cardona's guilt on first-degree murder and in establishing HAC, the sole aggravator found by the trial court in the penalty phase. At the guilt phase, the prosecutor argued that Cardona "participated in a greater amount of the abuse than Olivia Gonzalez did. That's the reason why, if the State needed witnesses and we have to choose between a rock and a hard place, that's why Olivia Gonzalez was brought before you as a witness. Olivia Gonzalez came in here and told you what happened." The importance of Gonzalez to the State's case was made even clearer during the prosecutor's closing argument at the penalty phase:
Where would youwhere would we be without her? Where would we?

*980 What would be known about this case had Olivia Gonzalez not testified?
There would have been a very large hole in the case that three months where this defendant, where this defendant binds and gags her child and puts him in this closet.
If Olivia Gonzalez was not here to tell you where Lazaro Figueroa was there would be no way to show that this defendant bound and gagged her own child and left him in this closet.
As defense counsel testified at the evidentiary hearing, once Gonzalez became the State's witness, the "best strategy in the case in terms of the physical evidence ... was going to be to indicate to the jury that Ms. Gonzalez was, in fact, the person who had caused the death of the child." Gonzalez became a "[v]ery significant" witness for the State. Kassier explained his strategy for his cross-examination of Gonzalez:
[M]y first objective was to make sure that the jury understood that she had ultimately admitted and, in fact, testified at deposition that she had administered one or two blows that, according to the Medical Examiner, was, in fact, fatal blows. I felt that was the most critical piece of evidence I had to get from her.
I wanted also to establish to the jury she had lied in the past when it was convenient for her. She was every bit as much facing the possibility of the death penalty at the time that she took her plea with the State.
And I was basically trying to challenge her credibility as to any point where she tried to absolve herself of guilt or shift the blame for the child's death on to Ms. Cardona.
At trial, Gonzalez minimized her own role in any abuse leading up to Lazaro's death and claimed she participated only to "please" Cardona with whom she was "romantically involved." Cardona, 641 So.2d at 361.[10] Indeed, the testimony of other witnesses as to the ongoing abuse and mistreatment of Lazaro implicated Gonzalez to a greater extent than suggested by the State's theory. Thus, the importance of impeaching Gonzalez with statements that she made to the prosecution before trial rests on what would have been Cardona's ability to further her theory that Gonzalez inflicted the fatal blow, or at least substantially participated in the abuse towards the end of Lazaro's life.
Finally, critical to the issue of Gonzalez's credibility as a witness at trial, and thereby important to our materiality consideration, the contradictions between Gonzalez's pretrial statements to the prosecutors and her testimony at trial after meeting with the prosecutors suggests coaching by the State of its most important witness. Coaching is suggested because the testimony that was altered between the time of Gonzalez's three interviews and the trial parallels the State's themes at trialthat Cardona was the primary abuser and Gonzalez participated to a much lesser extent, and only to the extent that she was a *981 "battered spouse" seeking Cardona's approval, that Cardona inflicted the fatal wounds, and that Gonzalez attempted to help Lazaro on the day of his death and Cardona did not.
When a particular witness is crucial to the State's case, evidence of coaching is especially material to that witness's credibility. See Rogers, 782 So.2d at 384. The defense could have used evidence of Gonzalez's changed story to further fuel its cross-examination of Gonzalez that the details of Gonzalez's story were the product of coaching. See Kyles, 514 U.S. at 443, 115 S.Ct. 1555 (stating that the implication of coaching "would have fueled a withering cross-examination, destroying confidence in [the witness's] story"). The implication of coaching would have added a new source of bias for the jury to consider when weighing Gonzalez's credibility and testimony. See Rivera Pedin, 861 F.2d at 1530; Brown, 785 F.2d at 1466.
The trial court concluded that the third prong of Brady was not met because Cardona was "sufficiently impeached." However, as discussed above, the availability of the three interviews would have provided additional valuable impeachment of Gonzalez's testimony. The inconsistent versions of critical events "would not have been merely repetitious, reinforcing a fact that the jury already knew; instead, `the truth would have introduced a new source of potential bias.'" Rivera Pedin, 861 F.2d at 1530. The contradictory versions of significant events, particularly in light of the implication of witness coaching, is qualitatively different from the matters on which Gonzalez was impeached.
The trial court concluded that Gonzalez's testimony was "not necessary to obtain the defendant's conviction," and thus there was no prejudice. However, the key to a finding of prejudice is whether the withheld evidence undermines our confidence in the result of the guilt and penalty phases. We conclude that the additional impeachment in this case does exactly this because it casts doubt on the veracity of Gonzalez's accounts of the history of abuse by Cardona and the events immediately preceding Lazaro's death. By withholding the interviews, which the State conducted for the alleged purpose of determining how Gonzalez would testify at trial, the State was then free to elicit testimony from Gonzalez at trial that contradicted Gonzalez's original statements in the interviews. The State then could use these themes (which also contradicted Gonzalez's original statements in the interviews) in its closing argument.
Because of the State's reliance on Gonzalez as its key witness, both to obtain its conviction of first-degree murder and to argue for the death penalty, we conclude that impeaching Gonzalez as to these material inconsistencies could have further undermined Gonzalez's credibility before the jury, and thus bolstered the defense's contention that Gonzalez, and not Cardona, was the primary actor in the abuse and death of Lazaro. In turn, the jury's assessment of the relative culpability of Gonzalez and Cardona could have affected its decision on whether to return a second-degree, rather than a first-degree, murder conviction.
If the jury had disbelieved Gonzalez, this could have affected not only the jury's evaluation of guilt, but also its recommendation of death. Even without this devastating impeachment evidence, the vote was only eight to four in favor of death. Further, the trial court's assessment of the weight to be given to HAC in relation to the mitigators could have been affected by serious doubt as to Gonzalez's veracity.
Finally, this Court's own proportionality review relied heavily on Gonzalez's version of the events as presented at trial without *982 the substantial impeachment presented by the undisclosed interviews:
We have compared this case to other death penalty cases to ensure that death is proportionately warranted. This review leads us to agree with the trial court that, in light of the extended period of time little Lazaro was subjected to the torturous abuse leading to his death, the ultimate sentence is warranted in this case.
Cardona, 641 So.2d at 365.
For all these reasons, we hold that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." Way, 760 So.2d at 913 (quoting Strickler, 527 U.S. at 290, 119 S.Ct. 1936). Accordingly, we reverse the trial court's order and remand for a new trial.
It is so ordered.
ANSTEAD, C.J., and SHAW, PARIENTE, and LEWIS, JJ., concur.
WELLS, J., dissents with an opinion, in which HARDING and QUINCE, JJ., concur.
WELLS, J., dissenting.
I do not agree with reversing the conviction and sentence in this case. My first observation from carefully reading the trial transcript of this trial, which consists of the testimony of fifty-four witnesses, is that the trial judge made a particularly conscientious effort to try this case in a fair way. Secondly, in this case, I believe it is a real advantage in evaluating prejudice that the trial judge was the same as the postconviction judge. Having been present to evaluate the witness Gonzalez in person reinforces the trial judge's finding on this prejudice issue.
Moreover, I conclude from a thorough reading of the record that there was clearly competent, substantial evidence to support the following finding by the trial judge in his sentencing order dated April 1, 1992:
[E]vidence presented in this case showed the victim was subjected to approximately 18 months of torture during his young life.... The medical evidence showed that massive abuse occurred including an unhealed fracture of an arm, skull fractures with underlying subdural and subarachnoid hematomas one arm that had been immobilized in which the muscles had been literally turned to bone as a result of multiple repeated trauma. His two front upper teeth were missing as a result of blunt trauma. Evidence of internal injuries after autopsy indicated blunt traumas which went back many months prior to the victim's death. The medical evidence of child abuse by the Dade County Medical Examiner was described as the worst he had ever seen in his medical experience. In addition this 3 year old child weighed 18 pounds at the time of death. The introduced medical records available showed at approximately 11 months of age he weighed 20 pounds....
The evidence indicated that the victim had suffered more than child abuse and was actually tortured during 18 months preceding his death.... Medical evidence indicated that the victim was kept in bed for such long periods of time that he developed bed sores, particularly on one side of his head. The evidence showed a slow methodical torture which defendant knew would ultimately cause death, sooner or later....
The medical examiner, Dr. Hyma, testified that based upon the physical injuries of the victim that excruciating pain was inflicted on this child over a long period of time....
This victim was alternatively [bound], gagged and tortured as well as being *983 starved to death. The photographs of the child taken at the location where the body was found show an undernourished child, one leg much larger than the other, multiple visible bruises, bloody areas of the head and facial area, soiled diapers, and other physical signs of recent child abuse.
In addition to these findings, my reading of the record is that what this trial developed was a long, sordid, and wretched tale of a cruel, torturous, lingering murder act, which more accurately can be said to have culminated rather than occurred on the day this child finally stopped breathing. The fact that this was such a long, tortuous ordeal, as found by the trial court and supported by the record, belies the significance of what the majority holds would have been the basis for prejudicial impeachment.
The record evidence is that the defendant had for a period of time lived with the victim child's father in an upscale apartment on Miami Beach. The defendant had three other children, two of whom lived with her in the apartment provided by the child victim's father. The father was murdered in an apparent illicit drug episode. The defendant was the recipient of $100,000 or more following the death but had to move out of the apartment. The defendant regularly used cocaine and soon spent the money she had received. Thereafter, the defendant began leaving the children with various acquaintances and was gone for weeks at a time. One of these acquaintances, when she could not reach the defendant, called the police, and the children were turned over to the State's family services agencies. However, the defendant did ultimately return, petitioned the dependency court for return of the children to her, and the children were returned to her. After the children were returned to the defendant, the defendant and the children moved from place to place in Dade County. There were numerous witnesses who testified as to the maltreatment of this youngest child, to whom the defendant was apparently particularly cruel for a long period of time.
Approximately 18 months before the child victim's ultimate death, defendant, while visiting a discotheque in Miami Beach, developed a relationship with Gonzalez. Gonzalez had a job and began paying for the support of the defendant and the children. Cocaine usage increased and turned into crack cocaine usage. Witnesses testified as to the deteriorating look of the child victim.
Following the child victim's death, the child's body was deposited in the bushes in front of a home in Miami Beach. The defendant, Gonzalez, and the other two children then left Miami and moved to St. Cloud, Florida, near Orlando. Soon thereafter, law enforcement was able to identify the defendant as the child's mother and to trace defendant to St. Cloud. When law enforcement located defendant, she gave them a statement in which she said that the child had stopped breathing after falling from a bed.
Based upon the evidence in the trial record and this trial judge's findings, I disagree with the majority's statements that, "The critical issue in this case was whether Gonzalez, rather than Cardona, was the prime perpetrator of the escalating abuse that culminated in the child's death. At trial, the State's strategy, based on Gonzalez's testimony, was to paint Cardona as the more culpable defendant." Majority op. at 970. My reading of the record is that the evidence was that this defendant was the child victim's mother, that the defendant first abandoned this child and then abused this child, and that the defendant was the constant prime abuser. This was not in reality a trial about relative culpability. This was a trial about a mother who tortured a child over a *984 long period of time, resulting in the child's death.
Thus, I disagree with the majority's characterization that what is claimed to be Brady material involved "significant[ly] contradictory" versions of events. The four ways that the majority says that the material could have been used as impeachment all involve the last day of the torture. I conclude that the majority misses the point of the evidence and the trial judge's findings, which was that this death was a result of a slow torture and that, as I said before, the last day was a culminationnot an occurrence.
What the majority points to as significant bases for contradictions in the reports are not direct contradictions of statements previously made by Gonzalez of her trial testimony. What the majority points to are, in actuality, negative inferences from reports of what Gonzalez said. These reports would even have been very difficult to use in effective impeachment, and the negative inferences, in comparison to the testimony about the mother's cocaine use and the long-deteriorating condition of her child, are not all that significant.
For example, whether Gonzalez was reported to have said that she was taking a "bath" has no import in this total picture. In respect to the report of the September 30, 1991, interview referred to by the majority, majority op. at 978, I fail to see the direct contradiction or again how that report would have been effectively used at trial. At the trial, Gonzalez admitted that she also beat the child victim with a belt and a bat. Gonzalez admitted to herself hitting the child once a day while being at various hotels but stated the defendant hit the victim more often.
Additionally, Gonzalez was deposed for over seven hours before trial after her plea. She admitted that she had not told the truth early in the investigation. Gonzalez was subjected to a wide ranging and effective cross-examination at trial. In that examination was the following at page 2972 of the transcript:
Q. Seems to me, Ms. Gonzales, you already admitted under oath, if anything your violence against Lazaro Figueroa got worse.
A. Yes.
Q. It escalated, didn't it.
A. Could you repeat the question, please?
Q. Your use of violence and abuse of Lazaro Figueroa escalated, didn't it"
A. Yes.
Q. The longer your relationship went on the more he bothered you?
A. Yes.
Thereafter, in great detail, Ms. Gonzalez's beating of the child was brought out.
I concurred in reversing Rogers v. State, 782 So.2d 373, 384 (Fla.2001), because in that case there was a Brady violation which caused prejudice. But here there was not. It is important that this Court's application of Brady not be so rote that we require a new trial in cases in which the information not disclosed would not have made a significant difference in the outcome of the trial.
Based upon the entirety of the trial court record heard by the trial judge in the courtroom, I clearly believe it to be reasonable for the trial judge to conclude that there was not prejudice to the extent that would require a new trial under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
HARDING and QUINCE, JJ., concur.
NOTES
[1] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[2] The trial court found two statutory mitigators, including the "under the influence of extreme mental or emotional disturbance," mitigator, based on Cardona's "fall from riches to rags" and daily cocaine use (the court failed to explicitly announce the weight attached), and the impaired "ability to conform her conduct to the requirements of law," mitigator, based upon her cocaine use (little weight). The trial court also found three non-statutory mitigators: (1) Cardona did not meet her biological father until she was twelve; (2) Cardona claimed that she was raped when she was eleven but her mother and father did not believe her; and (3) a guardian ad litem for Cardona's other two children recommended that a life sentence would be in the surviving children's best interest (the trial court failed to explicitly announce the weight attached). See id.
[3] These claims include: (1) Cardona was denied access to public records; (2) no adversarial testing occurred due to (a) the cumulative effects of ineffective assistance of counsel; (b) the withholding of exculpatory or impeachment material; (c) newly discovered evidence; and (d) improper ruling of the trial court; (3) the State withheld exculpatory evidence and presented false evidence, which rendered defense counsel ineffective; (4) ineffective assistance of counsel at the penalty phase; (5) ineffective assistance of counsel at the guilt and penalty phases due to the failure to provide background information to the mental health consultant; (6) Cardona was incompetent for trial; (7) the prosecution made comments, asked questions, and requested instructions, which were given by the trial court, that diluted the sentencing jury's sense of responsibility, and defense counsel was ineffective for failing to object; (8) Florida's statute setting forth the aggravating circumstances is facially vague and overbroad; (9) Cardona was denied effective assistance of counsel in pursuing her postconviction remedies because of the rules prohibiting Cardona's counsel from interviewing jurors to determine if constitutional error was present; (10) execution by electrocution is cruel and unusual punishment; (11) Cardona is innocent of the death penalty; (12) the trial court's sentencing order does not reflect an independent weighing or reasoned judgment; and (13) Cardona is insane to be executed.
[4] Huff v. State, 622 So.2d 982 (Fla.1993).
[5] These claims include: (1) Cardona's intellectual capacity; (2) defense counsel's failure to present defense witnesses to testify concerning intoxication and battered spouse syndrome; (3) defense counsel's failure to cross-examine Dr. Merry Haber; (4) defense counsel's failure to present testimony related to the polygraph examinations; (5) alleged Brady violations concerning Cardona's waiver of rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the State's accommodations to Elizabeth Pastor, who testified on behalf of the prosecution; (6) defense counsel's failure to seek change of venue; and (7) defense counsel's failure to present evidence pertaining to the "Abbott Avenue" defense.
[6] The issues raised in this appeal are: (1) ineffective assistance of counsel during the guilt phase, including: (a) Brady violation concerning Gonzalez's three interviews and the proffer letter from Gonzalez's attorney, (b) violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), as to Gonzalez's testimony, (c) Brady violation regarding Dr. Hyma, (d) Brady violation regarding Elizabeth Pastor, (e) failure to adequately cross-examine Dr. Haber, (f) failure to call the Slatterys, (g) failure to rebut battered spouse evidence, (h) failure to present the "Abbott Avenue" defense, (i) failure to seek to move venue, (j) failure to object to the prosecutor's inflammatory statements made in closing argument; (2) ineffective assistance of counsel during the penalty phase, including: (a) failure to present evidence of Gonzalez's involvement, (b) improper use of mental health experts, (c) failure to present the Abbott Avenue evidence, (d) failure to introduce Gonzalez's polygraph results, (e) failure to object to constitutional error, (3) Cardona was denied access to public records; (4) Cardona was incompetent at the time of trial; (5) Cardona is insane to be executed; and (6) Cardona is innocent of the death penalty.
[7] In preparation for using Gonzalez as a State's witness, State investigators had Gonzalez submit to a polygraph examination conducted by George and Brian Slattery. Although these statements were not used in the State's case, defense counsel was able to use these statements to impeach Gonzalez to the extent they contradicted her trial testimony.
[8] In its order, the trial court failed to provide a basis for its ruling on the claim as to the proffer letter. Because we conclude that a Brady violation occurred by the State's failure to disclose the typed criminal investigation reports, we do not reach the issue as to whether the nondisclosure of the proffer letter also constituted a Brady violation.
[9] The medical examiner's testimony that Lazaro's death cannot be attributed to any particular instance of abuse does not render evidence that Gonzalez may have delivered the fatal blow meaningless. First, it appears that the medical examiner, Dr. Hyma, originally advised that "the cause of death was from trauma to the head further being a massive ceribal [sic] Hematoma to the front left lobe extending to the top of the skull." Second, one of the State's themes was that Cardona inflicted all the abuse in the couple of months before Lazaro's death, including the fatal blow by the baseball bat.
[10] The State introduced testimony to show that Gonzalez had a dependent personality. However, one of the areas in which Cardona now claims her trial attorneys were deficient was in failing to question this assumption through cross-examination involving prior acts of misconduct. Cardona points to police reports filed before Gonzalez met Cardona documenting assault and battery charges. In one such report, Gonzalez was charged with "attacking and striking" her mother. In another, she was charged with aggravated assault involving a prior female lover. Finally, in an incident three months before she met Cardona, she was again arrested for battery on another female companion when she "got aggravated and started beating [victim] with hands and striking [victim's] head on floor." Because of our resolution on the Brady issue, we do not reach the question of trial counsel's ineffectiveness as to this issue.