641 So.2d 361 (1994)
Ana CARDONA, Appellant,
v.
STATE of Florida, Appellee.
No. 79787.
Supreme Court of Florida.
June 2, 1994.
Rehearing Denied August 31, 1994.
Lee Weissenborn, Miami, for appellant/cross-appellee.
Robert A. Butterworth, Atty. Gen., Ralph Barreira, Asst. Atty. Gen., and Penny H. Brill, Sp. Asst. Atty. Gen., Miami, for appellee/cross-appellant.
PER CURIAM.
Ana Cardona, who has been sentenced to death for the murder of her three-year-old son, appeals her convictions of aggravated child abuse and first-degree murder and the attendant sentences. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and affirm the convictions and sentences.
On November 2, 1990, the battered body of an unidentified child was found in the bushes of a Miami Beach residence. The child, who was called "Baby Lollipops," was later identified as Ana Cardona's three-year-old son, Lazaro Figueroa. Cardona eventually was *362 arrested and charged with aggravated child abuse and first-degree murder.
The following facts were revealed at trial. Prior to giving birth to Lazaro on September 18, 1987, Cardona lived with Lazaro's father, a well-off drug dealer named Fidel Figueroa. Cardona, Fidel, their two-year-old daughter, and Cardona's seven-year-old son lived in an upscale apartment and maintained a lavish existence. The month before Lazaro was born, Fidel was murdered. Fidel left a $100,000 estate that Cardona exhausted in ten months. During this time, Lazaro and his sister lived with friends and relatives. Lazaro and his sister were eventually turned over to the Department of Health and Rehabilitative Services. According to medical records, when Lazaro was eleven months old, he was healthy and weighed about twenty pounds. In November 1988, Lazaro and his sister were returned to the custody of their mother.
After the children were returned to her, Cardona became romantically involved with codefendant Olivia Gonzalez-Mendoza. Cardona and her children lived with Gonzalez-Mendoza in a series of cheap hotels. Gonzalez-Mendoza's various jobs and shoplifting were the women's only sources of income. During an eighteen-month period that began after the children were returned to her, Cardona beat, choked, starved, confined, emotionally abused and systematically tortured Lazaro. The child spent much of the time tied to a bed, left in a bathtub with the hot or cold water running, or locked in a closet. To avoid changing Lazaro's diaper for as long as possible, Cardona would wrap duct tape around the child's diaper to hold in the excrement. Cardona blamed Lazaro for her descent "from riches to rags," and referred to him as "bad birth."
Gonzalez-Mendoza was aware of the abuse and began to participate in the abuse because it pleased Cardona. According to Gonzalez-Mendoza, on the last day of October 1990, Cardona severely beat Lazaro with a baseball bat. After splitting the child's head open, Cardona locked the little boy in the closet where he had been confined for the last two months. The next day, Gonzalez-Mendoza opened the closet door and attempted to quiet Lazaro by frightening him with the bat. When Lazaro began to scream at the sight of his mother, Cardona grabbed the bat from Gonzalez-Mendoza. Gonzalez-Mendoza then left the room. When she returned, Cardona told her that Cardona believed she had killed Lazaro. After dressing the child, the two women took Lazaro to a Miami Beach residence and abandoned him in some bushes, where he was later found.
When Cardona learned that the child's body had been found she and Gonzalez-Mendoza fled to the Orlando area and then to St. Cloud, where they were later arrested. Cardona told police various stories about what had happened to Lazaro. Finally, Cardona claimed that the child had fallen off the bed and injured himself. When she couldn't revive him, she took the boy to a Miami Beach residence and left him on a doorstep so the people who owned the house could help him. Gonzalez-Mendoza concurred in each of the stories. Both women were charged with aggravated child abuse and first-degree murder. Gonzalez-Mendoza eventually admitted her role in the abuse, pled guilty to second-degree murder and aggravated child abuse, and agreed to testify against Cardona.
According to the medical examiner, Lazaro did not die from one particular injury; rather, he died from months of child abuse and neglect. When three-year-old Lazaro was found, he was emaciated, weighing only eighteen pounds. His diaper, which was heavily soiled, had been wrapped repeatedly with the duct tape. The child had numerous and extensive physical injuries, some of which were recently inflicted and some of which were up to a year old. It was impossible to date many of the injuries because of their composite nature, i.e., injury upon injury. Most of the injuries would have caused prolonged excruciating pain.
The medical examiner detailed the injuries as follows. Due to repeated injury, the muscle between the elbow and shoulder of Lazaro's left arm had turned to bone, rendering the arm useless. The child had deep bruises on his left hand and palm that were consistent with defensive wounds. Lazaro's right forearm was fractured, in a manner also consistent with a defensive wound. The *363 child's left leg, which was much thicker than the right, was engorged with blood. His feet and toes also had extensive deep bruises. Some of the child's toenails had been crushed. There were other deep blunt trauma bruises to the child's chest and buttocks. Lazaro's left eye was bruised and there was a laceration on his right eye. There were cigarette burns on the child's cheek and pressure sores all over his body, from being forced to lie in bed for extended periods. The inside of the child's lips was obliterated by scar tissue and his front teeth had been knocked out. There were lacerations to the scalp, the most recent of which was an open festering wound that had allowed meningitis bacteria to invade the child's brain through a skull fracture. The blow that caused that fracture also crushed the child's olfactory nerve. A later blow to the head had sheared the nerves connecting the spinal cord to the rear of the child's brain. According to the medical examiner, although this injury was fatal, Lazaro was already dying from his other injuries at the time the final blow was inflicted.
As explained by the medical examiner:
Lazaro Figueroa died from child abuse and neglect. Lazaro didn't die from one particular injury. Lazaro was physically abused over months of time.
He also was neglected over months of time resulting in malnutrition and anemia. He was physically abused to the point of having irreversible brain damage which eventually hastened his death.
The [final] injuries ... to his brain were not necessary to cause his death. They in and by themselves, they certainly could explain his death. But his death was a culmination of all of his injuries.
Lazaro also had an impending meningitis [resulting from the prior head injury]. Had he survived the most recent head injury, his meningitis would have been fatal had it not been treated.
Lazaro was a physically abused and neglected child, and that was the cause of his death.
The jury found Cardona guilty of both offenses and recommended death by a vote of eight to four. The trial court followed the recommendation. In aggravation, the court found the murder was especially heinous, atrocious or cruel. § 921.141(5)(h), Fla. Stat. (1991). In mitigation, the court found that at the time of the murder Cardona was under the influence of extreme mental or emotional disturbance due to her "fall from riches to rags" and daily use of cocaine. § 921.141(6)(b), Fla. Stat. (1991). The court also found that during her ingestion of cocaine, Cardona's ability to conform her conduct to the requirements of law may have been substantially impaired. § 921.141(6)(f), Fla. Stat. (1991). However, the court gave this factor little weight in light of the fact that Cardona was suffering from no major mental illness and she had adequate time while not on cocaine to take whatever action was necessary for her child's well being. The court also considered that 1) Cardona did not meet her father until she was twelve; 2) she claimed that she was raped when she was eleven but her mother and father did not believe her; and 3) a guardian ad litem for Cardona's other two children recommended that a life sentence would be in the surviving children's best interest.
In weighing the aggravating and mitigating circumstances, the court concluded that the aggravating circumstance of heinous, atrocious, or cruel "is overwhelming and of enormous weight," considering the "long period of time over which this baby was subject to torture, abuse, pain, and suffering." The trial court sentenced Cardona to death for the murder. The court imposed a consecutive sentence of fifteen years' imprisonment for the aggravated child abuse.
Cardona appeals her convictions and sentences. The State cross-appeals the court's refusal to instruct the jury on and to find the aggravating factor of committed during a kidnapping. § 921.141(5)(d), Fla. Stat. (1991).
Cardona raises the following claims in this appeal: 1) the failure to require a special verdict when a defendant is charged with both premeditated and first-degree felony murder is per se unconstitutional; 2) the court erred in refusing to sever the aggravated child abuse count from the first-degree murder count; 3) the jury charge taken as a *364 whole was so confusing that reasonable people could not understand it; 4) the trial court erred in refusing to give a Williams rule instruction and evidence was permitted to be received regarding types of child abuse not encompassed within aggravated child abuse; 5) during voir dire, the prosecutor preconditioned the jurors to find Cardona guilty of first-degree murder and to recommend that she be sentenced to death; 6) it was error, under Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), to instruct the jury on the aggravating factor of heinous, atrocious, or cruel; 7) Cardona should not have been sentenced to death when her equally culpable codefendant received a lesser sentence; 8) it was error to refuse to allow the defense to claim as a nonstatutory mitigating circumstance that it would be in the best interest of Cardona's surviving children that she be sentenced to life in prison; 9) the death sentence is unconstitutional as applied in this case; and 10) it is unconstitutional to require the same jury to hear both the guilt and penalty phases of a capital trial.
Claims one, two,[1] three, five, six and ten were not raised below. Because none of the errors alleged in these claims can be considered fundamental, these claims are procedurally barred. Mordenti v. State, 630 So.2d 1080 (Fla. 1994) (absent fundamental error, claims not raised at trial are procedurally barred); Steinhorst v. State, 412 So.2d 332 (Fla. 1982) (same). Moreover, even if these claims had been preserved for appeal, a review of the record and applicable case law reveals they are without merit. Claims three and five are refuted by the record. The remainder of the barred claims lack merit in light of prior decisions of this Court.[2]
Of the remaining claims, first, we address Cardona's claim that a Williams rule instruction[3] should have been given in connection with much of the evidence of abuse that was presented to the jury. At trial, the defense took the position that behavior constituting omissions, such as the withholding of food and the refusal to seek medical attention, is not willful torture, which is a necessary element of aggravated child abuse under section 827.03(1)(b), Florida Statutes (1989). Thus, the defense argued that an instruction limiting the jury's consideration of evidence of abuse that did not come within the statutory definition of aggravated child abuse should be given. The defense based this argument on Jakubczak v. State, 425 So.2d 187 (Fla. 3d DCA 1983), which held that acts of omission could not constitute willful torture under the aggravated child abuse statute. Based on this authority, the trial court had references to acts of omission deleted from the indictment. However, the court refused to give an instruction limiting the jury's consideration of certain acts of abuse that occurred during the time frame alleged in the indictment, reasoning that it was the State's theory that Lazaro's death resulted from the culmination of all the abuse inflicted during that period.
After Cardona's trial, this Court disapproved Jakubczak to the extent it held only acts of commission are contemplated under the aggravated child abuse statute. Nicholson v. State, 600 So.2d 1101, 1104 (Fla.), cert. denied, ___ U.S. ___, 113 S.Ct. 625, 121 L.Ed.2d 557 (1992). In Nicholson, we held that "a willful `omission, or neglect whereby unnecessary or unjustifiable pain or suffering is caused' constitutes aggravated child abuse under section 827.03(1)." (Footnote omitted). The trial court properly concluded that *365 all the evidence of child abuse heard by the jury was within the framework of the indictment. A limiting instruction was not warranted simply because the jury was presented with evidence of Cardona's limited interaction with Lazaro before his return to her custody in November 1988. On this record, the trial court did not abuse its discretion by refusing to give a limiting instruction.
Although the sufficiency of the evidence was not expressly raised in Cardona's initial brief, we granted Cardona's motion requesting that portions of her brief be treated as a challenge to the sufficiency of the evidence. However, we have thoroughly reviewed the record and find the evidence sufficient to support both convictions.
The remaining challenges are addressed to the penalty phase of the trial. We begin by rejecting Cardona's claim that it was error for the trial court to refuse to allow the defense to claim as a nonstatutory mitigating circumstance that it would be in the best interest of the two surviving children for their mother to be given a life sentence. The trial court did not preclude the defense from putting the surviving children on the stand[4] or arguing this factor to the jury. The court simply refused to admit into evidence a report of the children's guardian ad litem that concluded it would be in the children's best interest for Cardona to be given a life sentence. The guardian ad litem recommended that the two children should never see Cardona again. However, because of the guilt the children likely would feel if their mother was executed, the guardian concluded a life sentence would be in their best interest. The trial court did not abuse its discretion by refusing to admit the report into evidence or to allow testimony concerning the sentence Cardona should receive. Cf. Thompson v. State, 619 So.2d 261, 266 (Fla. 1993) (not abuse of discretion to refuse to allow defense witnesses to express their opinions concerning the appropriateness of death penalty), cert. denied, ___ U.S. ___, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993). The guardian ad litem's opinion in this regard shed no light on Cardona's character, record, or the circumstances of the offense. See Rogers v. State, 511 So.2d 526, 535 (Fla. 1987) (evidence that sentencer must not be precluded from considering, as a mitigating factor, must be relevant to defendant's character, record or the circumstances of the offense), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988); Jackson v. State, 498 So.2d 406, 413 (Fla. 1986) (sentencing jury need not consider, in mitigation, evidence that is not relevant to the defendant's character, record, or the circumstances of the offense), cert. denied, 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987). Moreover, although it was not required to do so, the trial court considered the report in mitigation. Under the circumstances, we find no abuse of discretion.
Cardona's seventh claim, that it was error to sentence her to death when her equally culpable codefendant received a lesser sentence, also is without merit. A codefendant's sentence may be relevant to a proportionality analysis where the codefendant is equally or more culpable. See, e.g., Scott v. Dugger, 604 So.2d 465, 468-69 (Fla. 1992); Hayes v. State, 581 So.2d 121, 127 (Fla.), cert. denied, ___ U.S. ___, 112 S.Ct. 450, 116 L.Ed.2d 468 (1991); Diaz v. State, 513 So.2d 1045, 1049 (Fla. 1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1022 (1988). However, the record in this case supports the trial court's finding that Cardona was the more culpable of the two defendants. Thus, the disparate treatment is justified. Rogers, 511 So.2d at 535.
We also reject Cardona's contention that imposition of the death penalty will result in cruel and unusual punishment and a violation of her due process rights. We have compared this case to other death penalty cases to ensure that death is proportionately warranted. This review leads us to agree with the trial court that, in light of the extended period of time little Lazaro was subjected to the torturous abuse leading to his death, the ultimate sentence is warranted in this case. Dobbert v. State, 328 So.2d 433 (Fla. 1976) (death warranted where defendant *366 murdered his nine-year-old daughter by continuous beatings, kicking, hitting, choking, and other torture and depriving her of medical care), affirmed, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).
Because we have determined the death penalty is warranted even absent a finding that the murder occurred during the course of a kidnapping, we need not address the State's cross-appeal. Accordingly, we affirm the convictions and sentences.
It is so ordered.
GRIMES, C.J., OVERTON, SHAW, KOGAN and HARDING, JJ., and McDONALD, Senior Justice, concur.
NOTES
[1] Although the defense did seek a severance prior to trial, the oral motion properly was denied as untimely.
[2] See, e.g., Young v. State, 579 So.2d 721 (Fla. 1991) (separate verdicts for each theory of first-degree murder not required), cert. denied, ___ U.S. ___, 112 S.Ct. 1198, 117 L.Ed.2d 438 (1992); State v. Enmund, 476 So.2d 165 (Fla. 1985) (proper to try defendant for both felony murder and underlying felony); Ellis v. State, 622 So.2d 991 (Fla. 1993) (joinder of separate counts proper where causal link exists between crimes charged in each count); Taylor v. State, 630 So.2d 1038 (Fla. 1993) (new standard jury instruction on the aggravating factor of heinous, atrocious, or cruel is not unconstitutionally vague under Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992)); Tompkins v. State, 502 So.2d 415 (Fla. 1986) (death qualified juries are not unconstitutional), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987).
[3] § 90.404(2)(b)2, Fla. Stat. (1991).
[4] In fact, the court ruled that if the defense chose to put Cardona's older son on the stand, it would not allow the child to be cross-examined by the State.