851 So.2d 678 (2003)
James BELCHER, Appellant,
v.
STATE of Florida, Appellee.
No. SC01-1414.
Supreme Court of Florida.
July 10, 2003.
*679 Nancy A. Daniels, Public Defender, and W.C. McLain, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction pursuant to article V, section 3(b)(1), of the Florida Constitution. For the reasons expressed below, we affirm Belcher's convictions and sentences for first-degree murder and sexual battery.

FACTS
The evidence presented at trial indicated that some time after 10:30 p.m. on January 8, 1996, but before 9 p.m. on January 9, 1996, James Belcher (Belcher) gained access to the victim's townhouse, where she *680 lived alone.[1] Belcher sexually battered victim Jennifer Embry (Embry) and then killed her by placing his hands around her neck and holding her head under water in the bathtub until she could no longer breathe. At 2 a.m. on January 9, 1996, Maxine Phillips, Embry's next door neighbor, was awakened by loud noises, which came from the common wall she shared with Embry. Phillips described the noises as three hard knocks, as if someone was knocking against the wall.
Medical Examiner Bonifacio Floro testified that the cause of Embry's death was both manual strangulation and drowning. White foam, a product of the mixture of air, water, and mucous in the trachea and bronchial tree, was discovered coming out of Embry's nose and mouth, which indicated to the medical examiner that she was alive and breathing when her head was submerged in the water. Linear bruising on Embry's neck and small internal hemorrhaging on her larynx and hyoid bone were consistent with her being manually strangled while she was still alive. Dr. Floro testified that Embry suffered from the following nonfatal injuries before her death: vaginal injuries consistent with forcible entry by a penis or object; a bruise above the right eyebrow; and a laceration to the right shoulder. He stated that the injuries were "fresh," indicating that they had been inflicted within twenty-four hours of Embry's death. Dr. Floro found spermatozoa in Embry's vagina and opined that they were "fresh" due to the fact that they still had both heads and tails at the time of the autopsy. Dr. Floro stated that although he could not pinpoint the time of the placement of the sperm, he opined that the condition of the sperm indicated that they had been placed there probably during a sexual act some time between three and six days before the autopsy.[2]
Detective Robert Hinson, the lead detective assigned to the case, testified that in the bathroom where Embry's body was found, there were some things apparently out of place. He related the following observations of the bathroom: one of the two parallel shower curtain rods was askew and had been propped up against the wall with a towel; one of the two shower curtains was pulled over to one side of the rod; the plastic hook that held up the decorative shower curtain was missing from the wall and found in the bathroom trash can with a piece of wall board still attached; and a strip from the plastic shower curtain liner was found in the bottom of the bathtub.
At the time of the murder, Belcher lived with his sister in a house that was close to the Florida Technical College, where Embry had attended classes until her death. Belcher had twice been observed at Florida Technical College in connection with Embry. Elaine Rowe, an employee at Florida Technical College, testified that in the winter of 1995, a man came into Rowe's office and asked for Embry by name, requesting that Embry be retrieved from her class. Rowe had someone retrieve Embry from her class and testified that to her knowledge, the man and Embry interacted that day. From a police photo-lineup, *681 Rowe identified Belcher as the man who came to her office, and she identified Belcher in court. Derrick Scott, a classmate of Embry's with whom she had a five-month affair, testified that one day before October of 1995, he walked out of class at Florida Technical College, and observed a man standing by Embry's car, talking with her. Scott identified Belcher from a side-shot photo, displaying a facial scar, as the man he saw talking with Embry by her car. Scott also identified Belcher in court.
On August 4, 1998, Detective Hinson questioned Belcher about Embry's murder. During that interview, Belcher denied (1) ever being at Embry's home, (2) ever having sex with Embry, and (3) ever meeting Embry. After Derrick Scott identified Belcher from a photo, Detective Hinson obtained a search warrant for a sample of Belcher's blood. At the time of the blood draw, Hinson observed that Belcher was nervous and holding a Bible, and that he had urinated on himself.
James Pollack, lab analyst for the Florida Department of Law Enforcement (FDLE), testified that the semen discovered in Embry's vagina and on a bedroom slipper found in the bathroom near her body contained DNA matching Belcher's DNA profile.
The jury found Belcher guilty of first-degree murder on the theory of both premeditation and felony murder, and guilty of sexual battery. After a penalty phase hearing, the jury voted nine to three, in favor of a death sentence. The trial court followed the jury's recommendation and imposed a death sentence for first-degree murder and sentenced Belcher to twentyfive years imprisonment for sexual battery. The trial court found that the State proved beyond a reasonable doubt the following aggravators in support of Belcher's death sentence: (1) the defendant has been previously convicted of a felony involving the use or threat of violence to some person (great weight); (2) the capital felony was committed while the defendant was engaged in the commission of the crime of sexual battery (great weight); and (3) the capital felony was especially heinous, atrocious, or cruel (HAC) (great weight). The trial court found that all of the mitigating factors that were presented were proven sufficiently for the Court to give them consideration. The mitigating factors in this case, all of which were nonstatutory, were: (1) in his relationship with family members, Belcher is considerate, generous and concerned; (2) Belcher loves his parents, brother, sisters, cousins, aunts, and uncles, and they love him; (3) Belcher has not lured anyone else in his family into trouble with the law, he has actually discouraged family members from engaging in criminal behavior and used himself as an example as to why they should not get involved in criminal activity; (4) Belcher has done many kind things for his family; (5) in spite of personal problems, Belcher has encouraged his cousins to do well; (6) Belcher has often been a mentor and a role model of integrity to his relatives; (7) Belcher has maintained contact with relatives even while in prison and continues to provide them advice and counsel, sometimes over the phone; (8) Belcher was raised in a high crime area in New York and was evidently unable to resist the temptations of crime; (9) Belcher was sent to adult prison at an early age and it affected his development; (10) Belcher has never abused alcohol or drugs; (11) Belcher has shown concern for younger inmates at Appalachee Correctional Institute (ACI) and has had a positive effect on their lives by being a tutor, basketball coach, a good listener, a counselor to young inmates, and a peacemaker; (12) Belcher can continue to help other inmates in the future, as evidenced by those who *682 testified at the penalty phase; (13) Belcher has not been a discipline problem either in prison or in the pretrial detention facility for the period of his recent incarceration; (14) Belcher displayed proper behavior during trial; and (15) Belcher displayed appropriate remorse and genuine concern for the distress caused to his family and the victim's family during the Spencer[3] hearing. The sentencing order indicates that the trial court assigned "some weight" to all of the mitigators, except for (11) and (12), to which it assigned "greater weight."

ANALYSIS
Although Belcher does not challenge his first-degree murder conviction, this Court has examined the record and has determined that there was sufficient competent and substantial evidence presented to support the conviction for first-degree murder. See Brown v. State, 721 So.2d 274, 277 (Fla.1998); see also Fla. R.App. P. 9.140(h) (requiring this Court to determine the sufficiency of the evidence, regardless of whether or not it is presented for review). As discussed in this opinion, eyewitness testimony connected Belcher to Embry and incriminating physical evidence linked Belcher to Embry's home where her body was found. We have referred to that evidence in some detail above.

PROSECUTION CLOSING ARGUMENT
Belcher claims that the trial court erred in denying his motion for a mistrial, which was made upon objection to the prosecutor's penalty phase closing argument, contemporaneous with the prosecutor's statements that the defendant's actions were to eliminate Embry as a witness.[4] Belcher states that because the State was not pursuing the avoid arrest aggravator, and because the evidence did not support that aggravator, the prosecutor's argument of an improper aggravating circumstance tainted the penalty phase and caused the death sentence to be unconstitutionally imposed.
We agree with the trial court's denial of a mistrial in this situation because although the prosecutor arguably crossed the line into discussion of matters that could also support the avoid arrest aggravator, which was not a relevant aggravator to this case, we find that any resulting *683 error was harmless. The prosecutor's comments did not constitute a wholly improper and prejudicial attempt to introduce the avoid arrest aggravator into this case. As the State points out, the jury was not subsequently instructed on the avoid arrest aggravator. Before instructing the jury on the aggravators of prior violent felony, murder in the course of a sexual battery, and HAC, the trial court instructed the jury that it was limited to consideration of only those three aggravators. In accordance with the standard jury instruction, the trial court stated: "The aggravating circumstances that you may consider are limited to any of the following that are established by the evidence...." Fla. Std. Jury Instr. (Crim.) 7.11. Thus, we find that the prosecutor's argument, because it was made within the context of this case regarding the prior violent felony aggravator, did not rise to the level that would require the trial court to declare a mistrial and order a new trial. See Teffeteller v. State, 439 So.2d 840, 845 (Fla.1983) ("Comments of counsel during the course of a trial are controllable in the discretion of the trial court, and an appellate court will not overturn the exercise of such discretion unless a clear abuse has been made to appear.").

HAC AGGRAVATOR
Belcher argues that the evidence in this case was insufficient to establish the heinous, atrocious, and cruel aggravator (HAC) because the medical examiner testified that Embry could have lost consciousness within thirty seconds to one minute of her strangulation, rendering her unable to feel pain. However, we find that there was competent, substantial evidence to support the HAC aggravator. This Court considers whether or not there was evidence of a struggle for further support of the victim's consciousness before death. See Bowles v. State, 804 So.2d 1173, 1178 (Fla.2001) ("Strangulation of a conscious murder victim evinces that the victim suffered through the extreme anxiety of impending death as well as the perpetrator's utter indifference to such torture. Accordingly, this Court has consistently upheld the HAC aggravator in cases where a conscious victim was strangled."). Evidence was presented at trial that Embry struggled with her attacker while she was still conscious, indicating that she was aware of her impending death. As the trial court noted in the sentencing order, there was evidence that the injuries to Embry's head, shoulder, and neck were inflicted while she was alive, supporting evidence of a struggle. We further note that the medical examiner's testimony that Embry was forcibly raped while she was alive supported evidence of a struggle while she was conscious. Other evidence at trial also pointed to signs of a struggle in the bathroom where her body was found: the shower curtain rod had apparently been knocked down and propped up with a towel; a piece of shower liner had been removed and was found in the tub with Embry's body; and a hook supporting the curtain rod had been torn out of wall and was found with a piece of the wall still attached. This Court has considered the HAC aggravator in a case of strangulation death, wherein the evidence was "unclear" exactly how long the victim remained conscious before death. See Barnhill v. State, 834 So.2d 836 (Fla. 2002), cert. denied, ___ U.S. ____, 123 S.Ct. 2281, 156 L.Ed.2d 134 (2003). In Barnhill, this Court held that a strangulation death can, indeed support a finding of HAC, stating:
The HAC aggravating factor applies in physically and mentally torturous murders which can be exemplified by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another. See Williams v. *684 State, 574 So.2d 136 (Fla.1991). HAC focuses on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death, rather than the intent and motivation of a defendant, where a victim experiences the torturous anxiety and fear of impending death. See Brown v. State, 721 So.2d 274, 277 (Fla.1998). Thus, if a victim is killed in a torturous manner, a defendant need not have the intent or desire to inflict torture, because the very torturous manner of the victim's death is evidence of a defendant's indifference. See id. Because strangulation of a conscious victim involves foreknowledge and the extreme anxiety of impending death, death by strangulation constitutes prima facie evidence of HAC. See Mansfield v. State, 758 So.2d 636, 645 (Fla.2000); Orme v. State, 677 So.2d 258, 263 (Fla.1996).
Id. at 849-50. Although Embry was probably only conscious for sometime between thirty seconds and a minute before her strangulation and drowning death, the evidence of a struggle between Embry and her attacker (located on her body and in the bathroom) establishes that she was likely conscious at the outset of the strangling and was aware of her impending death. See Walker v. State, 707 So.2d 300, 315 (Fla.1997) (holding that HAC was appropriately found in drowning death independent of whether the victim was conscious when she was thrown in canal because there was other evidence of a struggle); Rutherford v. State, 545 So.2d 853, 856 (Fla.1989) (holding that the evidence supported HAC where the victim was found in bathtub, cause of death was by drowning or asphyxiation, and physical signs of struggle were evident). Thus, we find that the trial court correctly instructed the jury about and properly found that Embry's strangulation and drowning death was especially HAC.

SPECIAL JURY INSTRUCTION
Belcher maintains that the trial court erred when it denied his request to read a special instruction to the jury, listing the nonstatutory mitigators presented. The record reflects that Belcher filed a list of mitigating circumstances with the trial court in statement form, enumerating the nonstatutory mitigators in the case.
In denying the defense's request to have the mitigation list read to the jury, the trial court stated:
I guess I have both concerns. One that it emphasizes the details of the defendant's mitigation over details of the State's aggravation and, secondly, it does run the risk of leaving out something that the jury might have heard that they would lump into the category of defendant's character, record and background because I didn't mention it in the instruction, which is my instruction to them, they would feel they shouldn't consider it, so I think we'll leave the instruction in the language that has been approved by the Supreme Court.... I'm not going to specifically provide details of that particular mitigator, but the defense can certainly provide those details in the argument.
The trial court instead recited a "catch-all" type of jury instruction stating:
Among the mitigating circumstances you may consider, if established by the evidence, are any aspects of the defendant's character or record or background, any other circumstances of the offense that would mitigate against the imposition of the death penalty.[5]
*685 We find that the trial court did not abuse its discretion by giving a "catch-all" jury instruction about mitigation instead of giving Belcher's list of nonstatutory mitigators. See Card v. State, 803 So.2d 613, 624 (Fla.2001) (finding that the trial court did not abuse its discretion when it denied the defendant's request to give an alternative jury instruction on CCP). Out of fairness to Belcher, the trial court gave serious consideration to Belcher's special instruction, but found that it was not superior to the "catch-all" instruction. See James v. State, 695 So.2d 1229, 1236 (Fla. 1997) ("The trial court is required to give only the `catch-all' instruction on mitigating evidence and nothing more."). Thus, we affirm the trial court's denial of Belcher's request to read the special jury instruction.

CONSTITUTIONALITY OF FLORIDA'S DEATH PENALTY SCHEME
Belcher challenges the trial court's denial of the defendant's motion to declare sections 782.04 and 921.141, Florida Statutes (2002), unconstitutional under the Sixth and Fourteenth Amendments and the U.S. Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Belcher claims that his death sentence should be vacated because (1) the indictment did not give notice of the aggravating circumstances on which the State would rely to attempt to establish eligibility for the death penalty; (2) the jury in this case was not told that the existence of any aggravating circumstance had to be agreed upon by all jurors; and (3) the jury's nonbinding recommendation was not unanimous. However, as the State points out, two of the three aggravators found in this case are exempted from an Apprendi analysis: prior violent felony and murder committed in the course of a sexual battery. Regarding the prior violent felony aggravator, in Apprendi, the U.S. Supreme Court exempted prior convictions from facts that must be submitted to a jury because they increase the penalty for a crime. Id. at 490, 120 S.Ct. 2348. The recent decision of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), did not disturb that particular holding. See id. at 597 n. 4, 122 S.Ct. 2428 (noting that Ring did not challenge Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), and that none of the aggravators in his case related to past convictions). Regarding the murder being committed in the course of a sexual battery aggravator, the fact remains that a unanimous jury found Belcher guilty of both murder and sexual battery, and therefore the guilt phase verdicts reflect that the jury independently found the aggravator of the murder being committed in the course of a sexual battery.
As for Belcher's challenge to Florida's death penalty scheme and how it relates to the remaining aggravator of HAC, we find that Belcher is not entitled to relief under the holding of Ring. This Court addressed a similar contention in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. We find that Belcher is likewise not entitled to relief on this claim.

PROPORTIONALITY
Although Belcher does not challenge the proportionality of his death sentence *686 on appeal, due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). This Court reviews and considers all the circumstances in a case relative to other capital cases when deciding whether death is a proportionate penalty and to ensure uniformity. See Johnson v. State, 720 So.2d 232, 238 (Fla.1998); Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998). The death penalty is reserved only for those cases where the most aggravating and least mitigating circumstances exist. See Kramer v. State, 619 So.2d 274, 278 (Fla.1993).
We find that the death penalty was not a disproportionate sentence in this extremely aggravated case, as compared to other similar cases that this Court has decided. In Branch v. State, 685 So.2d 1250 (Fla.1996), this Court affirmed the death sentence in a case where the aggravators were: (1) murder committed during the course of a sexual battery; (2) prior violent felony; and (3) HAC. Id. at 1252 n. 1. The trial court found the following nonstatutory mitigating factors: (1) remorse; (2) unstable childhood; (3) positive personality traits; and (4) acceptable conduct at trial. Id. at 1252 n. 2.
In Kimbrough v. State, 700 So.2d 634 (Fla.1997), this Court upheld the death sentence in a similar case where the aggravators were: (1) prior violent felony; (2) murder committed during the course of a sexual battery; and (3) HAC. Id. at 636. The trial court rejected the defendant's age as a statutory mitigator, but considered the following statutory mitigation: (1) unstable childhood; (2) maternal deprivation; (3) an alcoholic father; (4) a dysfunctional family; and (5) a talent for singing. Id.
In Banks v. State, 700 So.2d 363 (Fla. 1997), this Court considered another case which bears resemblance to the aggravators and mitigators involved in the instant case. The aggravators found by the trial court in support of the death sentence were: (1) prior violent felony; (2) murder committed during the course of a sexual battery; and (3) HAC. Id. at 365. The trial court found the statutory mitigator of age (little weight), and the following nonstatutory aggravators (little weight): (1) service in the military; (2) employment history; (3) good character; and (4) contribution to community and family. Id. In Banks, the trial court also found the following additional mitigation, but did not assign it "great weight": (1) appellant's potential for rehabilitation; (2) cooperation with the police; and (3) his love and support for his family. Id.[6]
Based on the totality of the circumstances in this case considered in light of this Court's prior decisions in other capital cases involving similar circumstances, we find that death is a proportionate penalty in this case.
Accordingly, we affirm Belcher's convictions and sentences.
It is so ordered.
WELLS, PARIENTE, LEWIS, QUINCE, and CANTERO, JJ., and SHAW, Senior Justice, concur.
PARIENTE, J., concurs specially with an opinion.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
*687 PARIENTE, J., specially concurring.
I concur in the majority opinion in this case, and write separately to expand briefly on the discussion of Belcher's request for a jury instruction detailing the nonstatutory mitigating factors, and also to explain my view of the grounds on which we are denying relief pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
In a specially concurring opinion in Downs v. Moore, 801 So.2d 906, 918-22 (Fla.2001), Justice Anstead discussed the denial of special instructions on nonstatutory mitigation in the context of United States Supreme Court precedent holding that a capital sentencer must receive an opportunity to consider and give effect to relevant mitigating evidence. Justice Anstead concluded:
The bottom line of these Supreme Court decisions is that juries must be given explicit and adequate instructions as to the factors they must consider in deciding whether to impose a sentence of death.
Consistent with the U.S. Supreme Court's repeated concerns, juries should be provided with specific guidance as to the type of nonstatutory mitigating factors that they may consider. Because the overly brief "catch-all" jury instruction neither mentions nor defines the various categories of nonspecific mitigation a Florida jury may consider, it may well be inadequate to provide for the type of individualized assessment of mitigation that the Supreme Court has mandated.
Id. at 921.
I concurred in that opinion, and continue to believe that in a proper case, in which the evidence is insufficient to warrant an instruction on the statutory mitigating circumstances contained in section 921.141(6), Florida Statutes (2002), an instruction that the jury may consider a specific circumstance in mitigation may nonetheless be warranted. Whereas each of the "statutory" aggravators is specifically enumerated for the jury, the standard catch-all instruction on mitigation provides no guidance on how to determine what factors are mitigating. In particular, facts indicating emotional disturbance, extreme duress, or impaired capacity which fall short of the threshold for statutory mitigation remain potentially significant considerations in a jury's advisory sentencing decision.
In my view, the trial court's actions in Duest v. State, 28 Fla. L. Weekly S501, ___ So.2d ____, 2003 WL 21467248 (Fla. June 26, 2003), should serve as a model for trial courts to follow in the exercise of their discretion to instruct on nonstatutory mitigation. In Duest, we rejected a claim that the trial court erred in declining to give the standard instructions on the two statutory mental mitigators, and pointed with approval to special instructions given by the trial court on the mitigators in terms comporting with the evidence.[7] We noted in Duest that the trial court did not suggest that the jury should give the mitigating factors any less weight than if it had received the standard instructions on the corresponding statutory mitigators. *688 See id. at S503-04, at ___-___. I encourage trial judges to follow this example where appropriate.
Nonetheless, I conclude that the trial court did not abuse its discretion in denying the expanded instruction in this case. The specific instruction submitted by Belcher did nothing more than recite a virtual laundry list of his proposed nonstatutory mitigation and, therefore, would not have provided greater assistance to the jury than the catch-all instruction alone. Accordingly, I agree with the majority's resolution of this issue in this case.
Regarding the effect of Ring, I concur in the affirmance of Belcher's death sentence because this case involves the aggravating circumstance of prior violent felony convictions: armed burglary and aggravated assault in 1989, attempted robbery in 1981, and robbery in 1976. See Anderson v. State, 841 So.2d 390, 409 (Fla.2003) (Pariente, J., concurring as to conviction and concurring in result only as to sentence) (defendant in direct capital appeal not entitled to relief under Ring where trial court found prior violent felony aggravator). In Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court exempted "the fact of a prior conviction" from its requirement of a jury finding of any fact that increases the penalty beyond the prescribed statutory maximum. Although the Supreme Court extended Apprendi to capital sentencing schemes in Ring, none of the aggravating circumstances in Ring involved prior convictions, and therefore the Court was not called upon to address the Apprendi exception. See Ring, 536 U.S. at 597 n. 4, 122 S.Ct. 2428.
Because the trial court's finding of fact on the prior violent felonies rendered Belcher eligible for the death penalty, it is unnecessary for us to address any effect Apprendi and Ring may have on the validity of the remaining aggravating circumstances, including HAC, as a foundation for the death sentence in this case. Additionally, because both Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002), involved successive postconviction motions, in my view neither case is dispositive in a direct appeal in which the issue is properly raised.
ANSTEAD, C.J., concurring in part and dissenting in part.
I concur in the majority analysis except for its discussion of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and the discussion of the rejection of Belcher's request for a special instruction on nonstatutory mitigation.[8]
For the reasons I expressed in my opinion in Duest v. State, No. SC00-2366, ___ So.2d ____, 2003 WL 21467248 (Fla. June 26, 2003), I cannot agree that the presence of an aggravating circumstance that is arguably "exempt" from Sixth Amendment requirements allows the Court to ignore the express mandate of Ring that aggravating circumstances used to justify a death sentence must be found by a jury and not by a judge alone.
*689 Implicit in the majority's proposition that certain aggravating circumstances are exempt from Ring and Apprendi analysis is the mirror proposition that other aggravating circumstances are not exempt. Notably, in the instant case, the aggravating circumstance that the majority does not conclude to be exempt is that the murder was especially heinous, atrocious, or cruel (HAC). See § 921.141(5)(h), Fla. Stat. (2001). The trial court not only independently found this "non-exempt" aggravator, but also assigned it "great weight" in its decision to impose the death penalty. I find it inconsistent to uphold a death sentence based upon a trial judge's finding of HAC, and the judge's assignment of "great weight" to that finding, while at the same time ignoring the fact that this aggravating circumstance was found and utilized in violation of Ring.
In effect, the Court has apparently determined that the judge's finding of HAC is harmless error because other "exempt" aggravating factors exist. However, the seriousness of this aggravating factor and the weight assigned to it by the trial judge in his sentencing decision obviously preclude us from finding that this error caused no harm.
NOTES
[1] No signs of forced entry were found at Embry's home. Embry's neighbor, Anna Alford, testified that she saw Embry come home alone at 10:30 p.m. on January 8, 1996. Ricky Embry, the victim's brother, testified that after Embry missed school and work on January 9, 1996, he went to her home around 9 p.m. to check on her. As he placed his key into the lock, the door "just came open." Ricky found Embry's body in the bathtub.
[2] Dr. Floro explained that sperm can survive longer in a dead body than a living body. He performed Embry's autopsy on January 10, 1996.
[3] See Spencer v. State, 615 So.2d 688 (Fla. 1993).
[4] The argument and objection during closing was as follows in pertinent part:

[Prosecutor:] Don't those violent crimes show his true character? Doesn't it show that he is a person who refuses to learn from prior experience? You might restate that. You might say he actually learned from one of those experiences. What did he learn regarding Ms.White? She was able to identify him. Ms. Embry wasn't able to come into this court and identify him.
[Defense:] Your honor, I think that is objectionable. It's a thinly veiled argument about elimination of a witness. Elimination of a witness is not an aggravator that the State has proved, nor can they do it, but that is what the argument is all about. It's not an argument about anything but that. Has nothing to do with any of the aggravators.
[Prosecutor:] With all due respect, I'm not arguing that as an aggravator. That's not one of the enumerated ones. I haven't said anything about the elimination of a witness. I'm talking about the prior violent crime, which I'm allowed to do that. That is a prior aggravator.
....
[Prosecutor:] What does this aggravator prove? That the defendant is willing to kill to cover his tracks. That he chose to kill, in addition to committing a dangerous violent felony, sexual battery.
[Defense:] Your Honor, excuse me. I renew the objection. I have to renew the objection I just made at the bench.
[5] The Florida standard "catch-all" jury instruction states: "Any of the following circumstances that would mitigate against the imposition of the death penalty: (a.) Any [other] aspect of the defendant's character, record, or background. (b.) Any other circumstance of the offense." Fla. Std. Jury Instr. (Crim.) 7.11.
[6] The trial court in Banks rejected the defendant's religious activities as a mitigator and found that Banks did not establish that he was under the influence of alcohol when the murder occurred. Banks, 700 So.2d at 365.
[7] The trial court in Duest instructed the jury:

Amongst the mitigating circumstances you may consider if established by the evidence are any aspect of the defendant's character, background or record and any other circumstances of the offense including but not limited to, ... [t]wo, the defendant was under the influence of drugs or alcohol at the time the offense was committed. Three, the defendant was under mental or emotional disturbance at the time the offense was committed.
28 Fla. L. Weekly at S504, ___ So.2d at ____.
[8] As to the trial court's rejection of a special instruction on nonstatutory mitigation, I would point to the concerns I listed in my separate opinion in Downs v. Moore, 801 So.2d 906, 918-22 (Fla.2001) (Anstead, J., specially concurring). In the instant case, the brevity and general nature of the "catch-all" instruction given by the trial judge provided no real guidance to the jury as to what it might properly consider during its deliberations and, in fact, may have served to diminish the mitigation Belcher introduced. The effect of this diminishment may be viewed as even more problematic given the import of Sixth Amendment jury protections announced in Ring.