959 So.2d 187 (2007)
Christopher OFFORD, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-1611.
Supreme Court of Florida.
May 24, 2007.
*188 Nancy A. Daniels, Public Defender, and Nada M. Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Bill McCollum, Attorney General, and Ronald A. Lathan, Jr., Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Christopher Offord pled guilty to first-degree murder and was sentenced to death after a penalty-phase trial. The only issue Offord raises on appeal is whether death is a proportionate punishment in his case, where the trial court weighed one aggravating circumstance against two statutory mitigators demonstrating that Offord suffers from serious mental illness. This Court has mandatory jurisdiction over all death penalty appeals. See art. V, § 3(b)(1), Fla. Const. The reason for our mandatory review was first explained in State v. Dixon, 283 So.2d 1 (Fla.1973), in which this Court upheld the constitutionality of Florida's death penalty statute:
Review by this Court guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case. No longer will one man die and another live on the basis of race, or a woman live and a man die on the basis of sex. If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great.

Id. at 10 (emphasis supplied).
For the reasons that follow, we conclude that when the totality of the circumstances of this case is compared to other capital cases, death is a disproportionate punishment. We therefore reduce Offord's sentence to life in prison without the possibility of parole.

FACTS AND PROCEDURAL HISTORY
During the early morning of July 31, 2004, Offord, who was twenty-nine years old, killed his wife by beating her with the claw end of a hammer. Offord, who had a lifelong history of serious mental illness, confessed to the murder in a videotaped statement taken by police and pled guilty to first-degree murder. Offord's statement and the testimony of the penalty-phase witnesses established the following facts.
Offord moved from Texas to Panama City, Florida, in February 2004. A short time later he ran out of money and moved in with David and Lisa Leasher, a couple he met at the motel where he had been staying. In March or April 2004, Offord met Dana Noser at a bar and they married four days later. Offord and Noser lived together until that June, when they decided to separate. However, they continued to see each other regularly.
On July 31, 2004, Noser took Offord to Granny's Kitchen, where he was a dishwasher. Noser returned to the restaurant at 11 p.m. to take Offord home when his shift ended. After Noser dropped Offord off at his apartment, she and some friends went to several bars. She returned at 3 a.m. and woke Offord. They went to a bar where Offord drank a few beers and shot pool. The waitress at the bar testified that Offord and Noser seemed to be getting along with each other. Around 4 a.m., Offord and Noser went to a Waffle House and ate breakfast. Several employees who knew the couple from previous visits testified *189 that Offord and Noser were very affectionate.
At 7 a.m., Offord showed up at the Leashers' motel room and told them that he had killed Noser. The Leashers did not believe Offord, so he returned to his apartment. Twelve hours later, around 6:45 p.m., Offord went to a bar where he told both the bartender, Arthur Sencil, and a part-time employee, Bill Yohe, that he had killed Noser. Sencil called the police, and Offord was arrested and taken to the police station. Offord confessed to the murder during a videotaped interview conducted by Detective Joe Cherry.
At the beginning of the interview, Offord stated that he is schizophrenic and ran out of his medication. He said that he did not intend to kill Noser but that he was hearing voices and just kept hitting her. According to Offord's statement, after leaving the Waffle House, he and Noser returned to his apartment and engaged in consensual sex. Offord took a shower and Noser became angry when he refused to return to bed. Offord went to the front room of his apartment to calm down but heard voices telling him to kill Noser. He retrieved a knife and duct tape from the kitchen and went back to the bedroom. Offord sat down on the bed next to Noser and she continued to insist that he lie down. Offord took a piece of duct tape, put it over Noser's mouth, and began to hit her with his fist. The duct tape did not cover her entire mouth so he grabbed a pillow to muffle her. He repeatedly told Noser to "shut up." He grabbed the knife and began to stab Noser in the face and chest. Offord then saw the hammer beside the bed and started hitting her face with it. Offord stated that he hit Noser about fifty times with the hammer and that he believed he eventually broke her neck.
Offord also stated that after he returned from the Leashers' hotel room, he drank a bottle of whiskey and took twenty Xanax pills in an attempt to commit suicide. He slept for a few hours and then went to the bar where he told Sencil and Yohe that he had killed Noser.
Dr. Charles Siebert, the Chief Medical Examiner for the Fourteenth District, testified that Noser died of blunt head trauma. Dr. Siebert stated that Noser suffered at least thirty blows to the face and numerous blows to her lower extremities. He opined that the amount of bruising and the fact that most of her facial wounds were superficial indicated that Noser was alive during much of the beatingfor at least fifteen to twenty minutesand suffered a high degree of pain.
The defense presented two witnesses. Jill Rowan, a clinical psychologist, examined Offord for competency, and reviewed and summarized his medical records from Texas and Florida. Rowan explained the documented history of Offord's mental illness, which showed that Offord has been troubled by mental health issues since the age of five. His Texas medical records revealed that at eighteen, Offord was transferred from county jail to a state hospital where he was diagnosed with impulse control disorder and marijuana, cocaine, and speed abuse. When he was nineteen, Offord was charged with robbery, found incompetent to stand trial and given antipsychotic drugs. While in prison at age twenty-four, Offord had urges to cut himself. Shortly thereafter, he was evaluated for social security disability and was diagnosed with schizoaffective illness, which is a combination of schizophrenia and mood disorder. Rowan further testified that Offord's medical records indicated he had a history of auditory hallucinations, which are a symptom of schizophrenia.
*190 Offord's Florida medical records showed that he was admitted to Bay Medical Behavioral Health Center ("Bay Behavioral") four timesFebruary, March, April, and Julysince his arrival in Florida in early 2004. During his last admission to Bay Behavioral, just three weeks before the murder, he was diagnosed with alcohol and cocaine dependency and schizophrenia. He was given medication and checked himself out against medical advice. Nurses' notes stated that Offord threatened to choke Noser if she came to a family therapy session and that Offord was so upset about Noser's continued calls to the hospital that he said he felt like killing her. Rowan explained that hospital staff may not have taken Offord's threats seriously because schizophrenia is a major mental illness and a person with this disease may not be grounded in reality and may be delusional, have hallucinations, and hear voices. She also stated that schizophrenics often ramble and are unable to communicate effectively.
Rowan concluded that Offord suffers from a mood disorder (bipolar disorder), a personality disorder (schizophrenia), and a substance abuse problem. She stated that Offord had a pattern of first being admitted to a mental health facility, where he would be prescribed psychotropic drugs and weaned off street drugs. Then, when he left the hospital, Offord would stop using his prescribed medicine and would return to using narcotics and alcohol, which eventually led to rehospitalization. She also stated that it was difficult to determine whether Offord voluntarily stopped taking his medications or whether this was involuntary as a result of his mental illness.
The second defense witness was Nancy Watson, a licensed clinical social worker. She met with Offord, reviewed his medical records, and spoke with his mother and one of his "careworkers." Watson testified that Offord lived with his parents until he was about five years old. At that time, his parents divorced and he lived with his father for a short period. There were some allegations of sexual and physical abuse and he was brought back to live with his mother and her new husband. Offord's mother told Watson that Offord was a very easy-going child until he was eight months old. He then became easily agitated and overactive, demanded attention, and had impulse control problems. Offord did not get along with other children, was teased and rejected, and started running away from home. Offord's mother also stated that when he was five, Offord began pulling the skin off his fingernails and at six he threatened to kill her, chasing her with a butcher knife. Offord was institutionalized for the first time when he was six years old and since that time he has lived outside an institution for only short periods of time. By age fourteen Offord was hearing voices and by age seventeen he was drinking very heavily.
At the conclusion of the penalty phase, the jury recommended the death penalty by a vote of twelve to zero. The trial court held a Spencer[1] hearing to allow both the State and Offord to present additional evidence and arguments concerning sentencing. The State presented the testimony of Amy Sweat, Noser's sister. Sweat testified that Noser was loved by her family and the most tragic consequence of Offord's actions was that Noser's seven-year-old daughter had lost her mother.
Offord then testified. Regarding the night of the murder, Offord's version of events was consistent with his taped statement. However, Offord did not testify that he heard voices telling him to kill *191 Noser. He also insisted that he could "fool any doctor you put in [his] face" and is not "crazy at all."
The trial court found one aggravating circumstancethat the murder was especially heinous, atrocious or cruel (HAC) and gave this factor great weight. The trial court found two statutory mitigators: (1) that the murder was committed while Offord was under the influence of extreme mental or emotional disturbance; and (2) that Offord's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. The trial court assigned these mitigating factors some weight and moderate weight, respectively. The trial court found two nonstatutory mitigators: (1) marital discord (little weight); and (2) drug and alcohol abuse (little weight). After weighing the aggravating and mitigating circumstances, the trial court imposed a sentence of death. The court found that although Offord experienced "some mental health issues, they did not outweigh the brutish, violent beating [Noser] endured while he attempted to remove her face with the claw end of a hammer."

ANALYSIS
The only issue before the Court is whether death is a proportionate punishment. In deciding whether death is a proportionate penalty, "we make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence." Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003) (citation omitted). We consider the totality of the circumstances of the case and compare the case to other capital cases. See Urbin v. State, 714 So.2d 411, 417 (Fla.1998). This entails "a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis." Id. at 416. In other words, proportionality review "is not a comparison between the number of aggravating and mitigating circumstances." Sexton v. State, 775 So.2d 923, 935 (Fla.2000) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)).
In this case, the trial court found one aggravating circumstancethat the murder was heinous, atrocious, or cruel. HAC is a weighty aggravator that has been described by this Court as one of the most serious in the statutory sentencing scheme. See Larkins v. State, 739 So.2d 90, 95 (Fla.1999). It "applies in physically and mentally torturous murders which can be exemplified by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another." Belcher v. State, 851 So.2d 678, 683 (Fla. 2003). Offord does not dispute the trial court's finding of HAC.
The trial court also found two statutory mitigators-that the murder was committed while Offord was under the influence of extreme mental or emotional disturbance and that Offord's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. This finding was based on extensive documented evidence of Offord's history of severe mental illness. Offord asserts that this substantial mental mitigation makes the death penalty inappropriate even though the HAC aggravator has been proved.
We have found death to be a proportionate punishment in three cases in which HAC was the only aggravating factor. See Butler v. State, 842 So.2d 817 (Fla.2003); Blackwood v. State, 777 So.2d 399 (Fla. 2000); Cardona v. State, 641 So.2d 361 (Fla.1994). However, we have also explained *192 that "[a]s a general rule, `death is not indicated in a single-aggravator case where there is substantial mitigation.'" Almeida v. State, 748 So.2d 922, 933 (Fla. 1999) (quoting Jones v. State, 705 So.2d 1364, 1367 (Fla.1998)). After reviewing the mitigation evidence presented at Offord's penalty phase and his videotaped confession, we conclude in this case that Offord's lifelong history of severe mental illness makes the death sentence in this single-aggravator murder a disproportionate punishment.
Although we found death to be a proportionate punishment in Butler, Blackwood, and Cardona, they are distinguishable from this case because each involved less weighty mitigation. In Butler, the defendant stabbed and strangled his ex-girlfriend. See 842 So.2d at 821. In imposing the death penalty, the trial court did not find any statutory mitigators and found minor nonstatutory mitigationthat the defendant was reared without his natural mother, was a loving and good son, was well thought of by neighbors and coworkers, and had a long-term substance abuse problem. See id. at 823. The defendant in Blackwood strangled his pregnant ex-girlfriend. See 777 So.2d at 402. The trial court found only one statutory mitigator, that the defendant had no significant history of prior criminal conduct, and eight nonstatutory mitigators, the most significant of which was that the defendant was suffering from an emotional disturbance at the time of the crime. See id. at 405.[2] In Cardona, although the trial court did find the two statutory mental health mitigators, this finding was based on the defendant's cocaine use. See 641 So.2d at 365. Qualitatively, the severe mental illness underlying the impaired capacity and extreme mental disturbance mitigators in Offord's case is more compelling than the cocaine addiction underlying this mitigation in Cardona.
Cardona is further distinguished by the fact that the victim was the defendant's three-year-old son, who died after suffering eighteen months of neglect and abuse. See id. at 362. In concluding that death was a proportionate punishment, we focused on the "extended period of time [the three-year-old victim] was subjected to the torturous abuse leading to his death." Id. at 365.[3]
The circumstances of this case are more akin to those presented in cases in which this Court has reversed death sentences on proportionality grounds despite the presence of the HAC aggravator. See Robertson v. State, 699 So.2d 1343 (Fla.1997); Kramer v. State, 619 So.2d 274 (Fla.1993); Nibert v. State, 574 So.2d 1059 (Fla.1990). Robertson involved a strangulation murder committed by a nineteen-year-old in the course of a burglary. 699 So.2d at 1344-45. The Court vacated the defendant's death sentence "in light of the substantial mitigation present," which included the defendant's age, impaired capacity, abused and deprived childhood, history of mental illness, and borderline intelligence. Id. at 1347. In vacating the death sentence in Kramer, this Court concluded that "[t]he factors establishing alcoholism, mental stress, severe loss of emotional control, and potential for productive functioning in the structured environment of prison are *193 dispositive." 619 So.2d at 278. In Nibert, this Court ruled that the trial court erred in failing to weigh substantial mitigation and that there was no need to remand for the trial court to reweigh the aggravating and mitigating circumstances because the death penalty was a disproportionate punishment. 574 So.2d at 1063. The Court noted that "substantial mitigation may make the death penalty inappropriate even when the aggravating circumstance of heinous, atrocious, or cruel has been proved." Id.
In this case, there is no question that Offord committed a brutal murder. However, the murder was unaccompanied by any motivation such as pecuniary gain or avoiding arrest, and without the aggravating circumstance of a prior violent felony. Further, Offord presented substantial mental health mitigation that is uncontroverted. Offord's mental illness undoubtedly contributed to this tragic crime as indicated by the trial court's finding of the statutory mitigators that the murder was committed while Offord was under the influence of extreme mental or emotional disturbance and that Offord's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law were substantially impaired. Although the trial court gave some credence to Offord's Spencer hearing testimony that he did not think he was "crazy at all" and that he "could fool any doctor you put in [his] face," this testimony was contrary to the extensive documented history of Offord's lifelong mental illness and repeated institutionalization.
In fact, Offord's case is notable because it is one of the most documented cases of serious mental illness this Court has reviewed. Through the uncontradicted medical records, a picture emerges of an individual with two serious mental illnesses schizophrenia and bipolar disorderwho has been in and out of institutions since he was just five or six years old. During a 2001 hospitalization in Texas, the staff considered Offord's prognosis poor and predicted that he would be unable to function well outside of a facility. This proved to be an accurate assessment because Offord was admitted to hospitals numerous times during 2002, 2003, and 2004. After coming to Florida, he was admitted to Bay Behavioral four times, the last on July 4, 2004, only weeks before the murder. In addition, Offord was receiving permanent social security disability payments because of his mental illness. Although Offord also has a substance abuse problem, his medical history indicates that his mental health significantly contributed to the murder.
As this Court observed over 34 years ago in Dixon:
It is necessary at the outset to bear in mind that all defendants who will face the issue of life imprisonment or death will already have been found guilty of a most serious crime, one which the Legislature has chosen to classify as capital. After his adjudication, this defendant is nevertheless provided with five steps between conviction and imposition of the death penaltyeach step providing concrete safeguards beyond those of the trial system to protect him from death where a less harsh punishment might be sufficient.
283 So.2d at 7. The final step is the mandatory review by this Court, which we found was one indication of "legislative intent to extract the penalty of death for only the most aggravated, the most indefensible of crimes." Id. at 8. For all the reasons we have explained, we conclude that this is not among "the most aggravated and unmitigated of most serious crimes" for which the death penalty is reserved. Id. at 7. Imposition of the death penalty would thus be a disproportionate punishment. *194 We therefore vacate the death sentence and remand for the imposition of a life sentence without the possibility of parole.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] Blackwood's sentence was recently vacated due to trial counsel's ineffective assistance for failing to investigate and prepare mental mitigation evidence. See Blackwood v. State, 946 So.2d 960, 976 (Fla.2006).
[3] Cardona's conviction and sentence were vacated in 2002 because the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). See Cardona v. State, 826 So.2d 968, 969 (Fla.2002).